May it please the Court, Fred Rowley, Jr. for Petitioner, Solar Energy Industries Association. FERC's new avoided cost rule is arbitrary and capricious because the agency reversed course on its interpretation of PERPA without acknowledging it was making that change or offering an adequate justification for it. In 1980, when FERC first interpreted PERPA and implemented that statute, it construed the statute to enable qualifying facilities to sell energy under long-term contracts with fixed rates that were based upon reasonable estimates and forecasts of a utilities avoided cost. Now, 40 years later, the agency has reversed course on that construction in two fundamental ways. First, in its 1980 order, FERC made clear that PERPA did not require that energy rates for qualifying facilities be tied to a utilities avoided cost calculated at the time of delivery. It specifically rejected, and here I'm quoting, a minute-by-minute evaluation of costs which would be checked against rates established in long-term contracts between qualifying facilities and electric utilities. That's from Order 69. Rather, energy rates could be fixed in contracts, what the agency called, quote, contractual commitments based by necessity on estimates of future avoided costs. So they could be based upon projections. Now, in its new orders, FERC says that fixed energy rates violate the statute. They violate PERPA if over the course of a or a term of a contract, contract rates exceed a purchasing utility's avoided cost determined at the time of delivery. There's a second related contradiction. In its 1980 order, FERC made clear that fixed energy rates satisfied the statute even though inevitably there would sometimes be deviations. Sometimes the fixed rate in a contract for the purchase or sale of energy would deviate from the avoided cost determined at the time of delivery. But FERC explained, quote, these potential deviations are a normal result of risk allocation resulting from contractual commitments or other legal obligations. And the agency went on to explain that these deviations, quote, must be permitted. They had to be permitted if the commission is to fulfill its mandate to encourage co-generation and small power production. Now, in its new orders, FERC has flipped its view on those rate deviations instead of being an incident of contract. Roberts. Counsel, PERPA doesn't define what an avoided cost is, correct? It does not, Judge Bumate. So how come FERC's interpretation — you're not suggesting FERC's interpretation under the time of delivery violates the statute? So, Your Honor, what I'm arguing now is not the Chevron argument. I'm arguing that the agency's flip is arbitrary and capricious. Just APA? That's right, Your Honor. And again, in its new order — because it's flipped its view on this. Now, all of a sudden, forecasts, if they exceed the avoided cost determined at the time of delivery, they violate PERPA, which is exactly the opposite position that it took in Order 69. But they acknowledged that change, right? I mean, I think you started out by saying that, Ray, if I understood you correctly, this was an unacknowledged change. I mean, I thought they were quite clear that they were changing course. And, you know, the reason they gave, you know, simplifying somewhat, is essentially, before we thought, you know, it's okay to allow these long-term rates because it'll all sort of average out, but we've now decided that maybe it doesn't all average out. I mean, why is that wrong? So, Your Honor, what the agency tries to do — so there's a couple of different points to be made there. What the agency tries to do is say, you know, in Order 69, in our original order, we always took the position that if you had a fixed contract rate and it exceeded the avoided cost determined at the time of delivery, at the end of a contract, that it would violate the statute. But that's not what Order 69 says. So — and you can tell that because in Order 69, the agency reasoned three things. Reasoned, one, you had to have fixed contract rates because qualifying facilities needed that revenue certainty in order to be able to get project financing. Also, that kind of risk of deviation was an ordinary contract risk. And in addition, you needed to be able to estimate and have forecasts. So if what the agency is saying now were true, right, so now they're saying, nope, you can't exceed the avoided cost determined at the time of delivery. In those contracts, you would have had to have a true-up provision, or you'd have to have a guarantee that the fixed energy rate would never exceed the avoided cost at the time of delivery. That's fundamentally inconsistent with the idea of contract risk. It's fundamentally inconsistent with the idea that qualifying facilities need that revenue certainty from a fixed rate. And so we submit that the agency's attempt to recast Order 69 is wrong on the face of the statute — I mean, of the order. But you don't have to take my word for it. The agency has previously construed Order 69 in the New York State electric and gas decision and in the briefs before the D.C. Circuit. And here's what the agency said. The prior rules were not predicated on the assumption that overestimations and underestimations would balance out over the life of an individual contract. So they weren't taking the position that these things had to balance out in an individual case. Rather, the Commission's 1980 preamble explained that even if in one case avoided costs turn out to be less than the rate specified in a qualifying facility contract, in other cases the required rate will turn out to be lower. So, Judge Miller, to get back to your question, we do think that despite the agency saying — saying that it's acknowledging this change, it actually isn't because it's saying, we never — we never construed orders — we never construed the statute in precisely the way that Order 69 says it — said it was construed, which is that, yes, sometimes fixed rates in a given contract would outstrip avoided costs determined at the time of delivery. But in other contracts, they would not — they would underestimate. If FERC never issued any regulations in 1980, would you have any argument? It seems like your only argument is that it contradicts some of the reasoning from 1980. Is that right? That's right, Judge Bumate. That's the argument that we're making now. It's the flip-flop. It is the agency's failure both to adequately explain that reversal, of course, and also its failure to acknowledge that reversal, of course, because it's saying, we're not changing our construction. We never said what we think, in fact, the agency said in Order 69. I'd like to note one other error, though. So, what's the agency's response? What does FERC say? They say, well, the facts change. They say that there was new evidence, and here, I'm pointing to paragraph 87 of the rehearing decision. They say that there's new record evidence. But when the rhetoric is stripped away about the agency's representations regarding overestimations and underestimations, what do you have? What does the agency say? It says, and I'm quoting here from page 54 of the respondent's brief, in some circumstances, fixed-avoided energy rates have exceeded actual avoided energy cost rates. That's exactly the same factual underpinning, agency's words, that underlied Order 69. So, the facts actually found by the agency are precisely the same determinations, the same predictions, that grounded its initial order. And so, you have a course reversal. Why couldn't the government just say that, you know, it's 40 years later, different administrations, we just disagree with, you know, the resolution or the analysis from 1980? Because, Your Honor, Fox teaches us that when the agency is saying we're contradicting the facts that grounded our initial order, it has to provide some kind of a detailed explanation. It's got to explain why it changed course. And here, again, when you strip the rhetoric away, it is the same prediction about what would happen with overestimations and underestimations. Now, one other thing that the agency says, and I see here that I'm running out of time, but one of the things that the agency said is that, you know, we were wrong. Right? The factual presumption or underpinning that overestimations and underestimations would balance out, that ends up not being right. But the agency specifically disclaims any intent to make a systematic finding on that. It doesn't find that over the run of contracts on an industry-wide basis that overestimations and underestimations would not balance out and that the fixed energy rates would be too high. It says at page 54 of its brief, that was not the commission's finding. The commission found instead that, again, in some circumstances, only in some circumstances, fixed avoided energy cost rates have exceeded actual avoided energy cost rates. So, again, we are left with the same factual record in Order 69 in a course reversal that is not adequately explained or acknowledged. I'd like to reserve the balance of my time for... All right. David Bender. Morning. May it please the court, David Bender, on behalf of Public Interest Organization Petitioners. I'm going to try to reserve three minutes for rebuttal. Public interest organizations raise four separate challenges to FERC's purposeful rulemaking. In the interest of our limited time this morning, I intend to cover two things. First, one brief clarification, something that came up just now in Your Honor's questioning. And second, to focus on FERC's failure to comply with NEPA, unless the court has questions about the other challenger. First, a clarification. I think the court asked counsel whether the statute defines avoided cost. And as it was known, that's correct. It doesn't define avoided cost because that's FERC's term. FERC created the term avoided cost, but it reflects and includes the statutory definition that is provided for incremental cost of alternative electric energy, which is in 824A3D, which is essentially a but-for cost. The avoided cost or the incremental cost of alternative energy in the statute is what it would have cost the utility to purchase the energy it would have acquired, but for the qualifying facility. Turning to NEPA. Fundamentally, NEPA imposes a show-your-work obligation on agencies so that the court can check the agency's homework to determine whether the agency took the required hard look at the possible environmental impacts of its actions. FERC failed to show its work in this case. In fact, this is one of those cases where the agency didn't even turn in the homework. FERC instead takes the position that NEPA does not apply unless the agency approves a particular construction project at a specific site with easily identifiable impacts. That's not the law. NEPA is about future potential impacts. Those are inherently uncertain. As this court held in Connor v. Burford, FERC's obligation to estimate impacts does not depend on its ability to fully ascertain the precise extent of those effects. FERC also overstates the uncertainty here. It's readily foreseeable that states are going to adopt the rollbacks from FERC's rules. First, some states jumped the gun and adopted several of the rollbacks before FERC's order was even final, allowing them to do so. Other states actively advocated for these rule changes in front of FERC, so it's pretty foreseeable that those states are going to adopt the changes. Third, some utilities, including those represented by intervenors, are not regulated by states and self-implement these rules. So the fact that they're here defending them also is a pretty good indication that those utilities are likely to implement the rules. But counsel, even if we can make some projection of which states adopt the rules, we then have to make sort of an economic projection about the effect on qualifying facilities. And from the alignment of the parties here, we can have some idea of what everybody in the industry thinks the effect is gonna be. But we then need to make some projection about what is the mix of solar or cogeneration or other kinds of facilities. And the question of how do you do that analysis or can you do that analysis is one where FERC has a lot more technical expertise than we do, and they said, we don't think we can do it. So what is the basis on which you want us to say, no, you're wrong, you actually could do this? Right, so FERC says, in this case, we couldn't possibly do an economic analysis of what the impact on the energy mix would be from these certain market changes, right? And that's belied by the fact that they did exactly that in 1980, when they promulgated the original rules. They did it in 1988, where they proposed a revision to FERC's purple rules, which included just a small part of what they ultimately included in this rulemaking package. It's also inconsistent with what they did in 1996, where the agency did a NEPA analysis when it redid the rules for the entire wholesale market across the country and what that would do to the energy mix and what the pollution impacts from that would be. It's also inconsistent, your honor, with what energy regulators do on a daily basis, right? There are consultants and models that, you know, their entire purpose is to determine what impact there is on the mix of generation across regions and across the country if different toggles are pulled, right? In market incentives, fuel prices, demand growth, all those kind of things. And what regulators and utilities do to account for uncertainty is they run different assumptions through it to bookend their analysis. So you deal with uncertainty by running a low case, a mid case, a high case. And what that'll do is it allows for uncertainty, but it also tells you what the range of possible impacts are. Frickin' none of that for this order. Instead- So if NEPA, the failure to do an EA is the only violation in this case, I'm not saying that that's how it's gonna come out. We haven't even discussed the case. But if that's the only error in this case, what's the remedy? The remedy is vacature, your honor, for two reasons. One, that is the typical remedy for NEPA violations because of the purpose of NEPA. NEPA is a look-before-you-leap requirement. And if the agency failed to look, we make them go back and take back the leap and make sure that they do the required analysis because of the assumption inherent in NEPA that the analysis has a purpose and it influences and advises the agency's decision. Frickin' relies heavily, almost exclusively, for its position on this court's readily distinguishable case in Center for Biological Diversity versus Alano. Alano turned on two points that aren't present in this case. First, a congressional enactment specifically intended to avoid the time delay of NEPA review to quickly address specific fire dangers in that legislation. And second, a congressional enactment that agency action challenged in that case did not change the status quo. In this case, PERPA has no similar NEPA exclusion, has no similar time constraints. And in fact, the entire purpose of Frick's rulemaking here was to change the status quo, to change the legal rights, responsibilities, protections for qualifying facilities compared to utilities. Would you acknowledge at least that under NEPA, the most common place where it's necessary is when the government enacts a project, like a construction in Alano's forest area. And this is a little different than that. It's a rule regulation that can be adopted by states. It seems very different than constructing an airport or affecting the forest. And I don't know the exact numbers of what is more common, but programmatic NEPA review is fairly common, right? So for the predicate in Center for Biological Diversity versus Alano, is there was a forest management plan in place before the actions given rise to that case. And that forest management plan, which is maybe similar to national rules for PERPA, included a NEPA review. So I think NEPA applies to both types of action. And what, I mean, can you address the DC circuit decision in Sierra Club, the natural gas export case? Where, I mean, because it seems like, you know, there they said, you know, the effect of natural gas exports on natural gas productions is too hard to predict. You don't have to do a NEPA analysis. And this seems a couple of steps beyond that. So what's your answer to that? Respectfully, I think this is several steps in front of, instead, because the natural gas export market, I mean, it's a national market and the export, so I understand the facts in that case, the export capacity wasn't the limiting factor. Whereas in the electric markets, supply and demand have to match all the time. And so the models, you know, use dispatch order and the relative price between facilities and necessarily, right, a megawatt hour from a new qualifying facility, sold facility, displaces whatever is the marginal unit in the dispatch stack. There's a direct cause relationship between the two. I see that I'm almost out of time. I'm sorry, can I ask one more question? Can you address the standing question? How are you standing to assert a NEPA violation? Sure, Your Honor, thanks for the question. The interveners incorrectly categorize or characterize petitioners' standing as speculative chain of future possibilities in unspecified manner, unspecified locations. First, under this court's NEPA case law, NEPA has a lower threshold for standing because of the nature of the statute and the procedural injuries. But regardless of that, that doesn't reflect the record in this case. Petitioners submitted a number of supplemental declarations for standing, including two expert declarations. And those two expert declarations directly connected all the links of the chain from undermining PURPA development with a lack of price certainty to which units, which fossil fuel units are on the margin and will be displaced by new generation for two separate utilities in two separate states, to the pollution from those fossil fuel facilities that are upwind from petitioners' numbers. So the bottom line is, under these rule changes, pollution would increase somehow and then affect the organizations. The net, there'll be net more pollution as a result because zero- Nationwide, is that? Yes. Because, and the link goes, fewer qualifying facilities as a result. We've seen that in the states that already adopted some of these changes as a precipitous drop-off. To, if you don't have that clean energy, which has a zero marginal cost, that does not then displace the fossil generation, which always has a fuel cost and always has a marginal cost in the dispatch order. So there's a direct way. Thank you. All right, thank you, Council. I didn't do a good enough job in helping you keep track of your time and our questioning took you over time as well. So I'll add a few, a couple of minutes on the clock for when you come back. Your Honors, Matt Estes appearing here on behalf of the Federal Energy Regulatory Commission. And the argument that my friend, is that what we say in this court? My friend, Mr. Rowley made on the fixed rate rule relies on a mischaracterization of what the commission actually did and found. The commission explained in detail that it was not finding in this rule that avoided cost rates may not be based on estimates. It did not find that they have to be based solely on the costs at the time of delivery. In fact, the commission held that qualifying facilities are entitled to fixed avoided cost rates equal to the avoided capacity costs, which is the same thing that the petitioners refer to as long-term costs. Qualifying facilities retain that right. That right was not rescinded at all. The commission stated that over and over in its orders. The commission also stated that the energy rates, which are the short-term avoided costs, also could continue to be based on a long-term fixed estimate. If that's what the state deemed was appropriate to comply with the avoided costs cap. What the commission did say was that it was no longer going to require the use of an estimate by the states of the short-term costs. The states were still required to use an estimate of the long-term costs and allow that to be a fixed rate. But the short-term costs, if the states believed that use of a fixed estimate would lead to an above avoided cost rate, then they could, if they chose, require to have the energy rate vary during the term of the contract. But even then, it said that the energy rate could be based on estimates, just as states had always been able to have a short-term rate vary based on estimates. So the entire argument that the commission has somehow changed its interpretation or changed its policy without explaining it is just not correct. I think Judge Miller, you pointed out that the commission did explain what change it actually made and it explained the reasons for that. Those reasons were that it was not necessarily the case that overestimations and underestimations would balance out over the term of a contract. And the- Council, let me ask you this. The data that FERC relies on in its conclusion that over and under payments from fixed rate contracts under the old rule hadn't balanced out, and that's the reason for the revision, that appears to be limited assertions from the utilities themselves. Is that an adequate basis to reasonably conclude that the change is warranted? You can draw inferences on what happens to the national energy market just from those assertions. I recognize that we don't require perfect statistical data, but is that too thin of a record in this particular case? Well, Your Honor, I respectfully have to disagree. The evidence wasn't limited to evidence submitted by the utilities themselves. I think everybody acknowledged, even some of the petitioners, that energy prices starting in around 2008 to around the present, I don't want to say suffered because it was good. There was a precipitous and unexpected decline in natural gas costs, which led to a unexpected reduction in energy costs  And since the avoided cost is based on the cost of the energy they produce, an unexpected reduction in the cost of energy, avoided cost of energy. Now the petitioners characterize that as an aberration, but that proves exactly the point the commission was trying to make, which is these predictions by their nature are, or at least might be, might be incorrect. And I think the history as the Harvard law, Harvard Electricity Law Organization pointed out, these aberrations illustrate the inherent unreliability of energy projections. So I think it's universally, or maybe not universally, but mostly agreed by all parties that this did happen. Now, again, the commission did not find because that wasn't what it was needed to support its holding, that it doesn't necessarily happen or it doesn't happen all the time. But the fact that it believes that the assumption that it based the rule on in 1980 was not necessarily the case, that that required it to at least give the states, which purpose assigned the responsibility of setting the rates that gave them, it should give them the ability to decide whether they could rely on these projections. I also want to respond briefly to the idea that the commission in 1980 acknowledged that maybe this could happen, that maybe they would, that the rates wouldn't balance out. I just don't think that's what the commission said. The commission acknowledged that if they don't balance out, that that could be, that could end up in an above avoided cost rate. It just said it assumed over the longterm that they would balance out. And you have to remember at that time, there wasn't any experience. This was a projection they made based on what they thought would happen. But now 40 years later, the commission does have a lot of experience. And based on that experience, it decided it was no longer appropriate to require the states to permit a longterm fixed energy rate, which is the estimate of the short term costs. The longterm costs utility, qualifying facilities are still entitled to that. Before you use up too much of your time, can I just ask you to address the NEPA? Yes, I was going to do that right now. So I mean, the commission did a NEPA analysis when it adopted these rules back in 1980. You know, when it modified them, you've done them for other order 888, open access transmission. You did a NEPA analysis. What is it about this one that just defies prediction and makes it impossible to do one? Well, certainly there are computer models, as Mr. Rowley pointed out, that you can use. But you have to have the ability to put in the appropriate assumptions. And there are a lot of reasons why that would be difficult here. Let me just start off with the assumption that the petitioners say, start off with, which is that the revisions to the PURPA rule would bring the development of qualifying facilities to a halt. Now, that is not what the commission found. The commission found specifically that its rules would continue to encourage qualifying facilities. And the early returns, I would point out, show that that's true. The Chamber of Commerce presented statistics showing that in the first two months of fiscal year 2022, over 150 qualifying facility applications had been submitted. So it's one thing, perhaps, to try to make assumptions about how many qualifying facilities, about what environmental effects would be if you assumed that qualifying facility development died out. It's much harder to make any kind of assumption when the commission found that, in fact, qualifying facilities continue to be encouraged. So there is also speculation, because in order to do this kind of assumption, you also have to determine, well, what would happen if, in fact, qualifying facilities, renewable qualifying facilities, which I think is the main type that they're referring to, if fewer were developed. And here we have something that wasn't the case in the past, and it makes this unique, I think, among all NEPA cases. And that is, as the commission pointed out, PURPA is not the main way forced today behind the development of renewable resources. There are a large number of states that support PURPA outside of, or support renewable resources outside of PURPA. In addition, as the commission pointed out, there has been an explosive growth in the last 10 years in renewable resources being developed outside of PURPA. But those may all be reasons why the environmental consequences may be less bad than the petitioners are saying. But the premise of NEPA is that these sorts of big policy decisions should be guided by some consideration of what the environmental consequences might be. And somebody who wanted to know the environmental consequences of a decision would want to look at, and there may be some range of uncertainty, but what's the best case, what's the worst case, what's the most likely? You wouldn't just say, well, I'm not sure, so I'm not gonna look at it at all. So this gets back to the question I started with. Why was it appropriate to not even attempt any of this analysis? Well, I think the various cases that the commission relied on all say that you can make some assumptions, but they have to be reasonable assumptions. There's a certain amount of speculation that's not required. What was different about this situation as compared to the 1980 regulations? Because an environmental assessment was done in that case using simplified assumptions. Why can't the same sort of simplified assumptions be employed in this particular case? Well, Your Honor, as the commission explained, back then there was essentially no development of generation outside of the utilities. So it was reasonable to assume at that point that by instituting its regulations, it would encourage a certain amount of qualifying facilities. And once you make that assumption, then you can make assumptions about what the effects of that will be, what utility generation will back down. Here, we already have both a existing PURPA program in the commission's judgment, revisions that continue to encourage development. So it's much harder to figure out if we're continuing to encourage development, what, if any changes at all, would there be in the first place? And then second, at that time there was no other generation that would step into the place of the utilities that the commission assumed would be displaced. Here, if we assume that PURPA facilities would not be constructed, the likelihood is that they would just be replaced with other renewable resources. That certainly would be very difficult to evaluate. So those are two important differences. Could you address the question that Judge Wynn asked Mr. Bender, which is, if we were to decide that the commission violated NEPA, what's the commission's view on the appropriate remedy? We would think the appropriate remedy would be to remand, not to vacate. And why is that? I mean, isn't the presumptive remedy for a NEPA violation to vacate the agency's action? That is, but the courts also take into consideration the nature of the violation and the disruption. And in terms of the nature of the violation, this is a procedural violation. I think doing an EA, the commission could still find, as it did, that it's entirely too speculative to make any kind of reasonable assessment. So I think the odds are that it's not a critical violation. So if we were to remand without vacating, then what would be the harm to FERC? The rules would keep on going and an EA could be done. And if it shows that there was, either it's too speculative or there's minimal environmental impact, then the rules can go forward. But if we do remand and you do find there's a significant environmental impact, then we adjust and it should have been done anyway, right? Well, it would be just doing essentially the same thing the commission already did. This court has held that NEPA does not require form over substance. And that's essentially what the petitioners are arguing, that the commission should have labeled their analysis as an EA rather than saying that no environmental statement was, no environmental statement was required. So it seems pointless to remand and tell the commission to do what it has already done. Just because- So if an environmental EA is done and it shows there's a huge impact on the environment in a negative way, what can, what would happen at that point? Then the commission would have to take that into account in some fashion. I don't, I can't say how they would do that because- Would they have to rescind these rules, rule changes? No, they wouldn't have to. NEPA doesn't require an agency to find that there's no adverse environmental effects. It just requires them to evaluate them and take that into consideration in making its decision. But here again, there's no evidence that that would happen, particularly given that the only environmental impacts that are even claimed are based on a mischaracterization of what the rules do. The rules continue to encourage qualifying facilities. So in that case, it's hard to imagine how there could be any finding of a significant environmental impact. Well, but I mean, the rules, I mean, they obviously don't encourage qualifying facilities as much as the old rules did. I mean, like you're not suggesting, petitioners may be mistaken about the law, but it's hard to believe that they're mistaken about their interest in the case. Well, they might not, but then again, it's also the case that there's, it's speculative as to whether those facilities would be replaced by other renewables. So, but even though, even if they don't encourage to the same extent they did, it still makes it much more speculative than they would assert as to what any impacts would be. All right. Thank you, counsel. Our questioning took you over time. Thank you, your honor. I'm here to answer your question. And so I could answer more if you want. Thank you. Good morning, your honor. Jeremy Marwell for the respondent intervenors. If I could offer one overarching comment and then turn straight to standing and NEPA, and if we get to it, remedy. The overarching comment, FERC's orders here made incremental market-based updates to align the 40-year-old regulations with modern energy markets and to protect rate payers, utility customers for overpaying for QF power. It is particularly difficult for petitioners to show on the substance that the kinds of changes made here, giving states more flexibility, creating evidentiary presumptions that can be rebutted in the case of particular circumstances that weigh in the opposite direction, that those are arbitrary and capricious. On NEPA, I'd like to start with standing since we briefed that. I think it is potentially helpful analytically for the government because the, I'm sorry, potentially analytically helpful for the court because the doctrinal waypoints are a little closer together. The Supreme Court has been very clear that Article III standing theories that rest on a long chain of inferences are disfavored. And that's what we have here. That concern underlies both the substance of why the commission said it wouldn't do a NEPA review, but I think also why it is hard for petitioners to show what they have to show, which is a probable relationship between these orders and their concrete environmental interests. This court has had found no standing in the Navajo Nation case, which was cited in the reply brief by petitioners, where the court said the chain of causation was too long and spindly. That was the court's word. And the Bellin case, which said the petitioners hadn't shown that connection for standing purposes, where the concern was with greenhouse gas emissions from certain known refineries. Here were several layers beyond that. And so I think the standing analysis is just a little bit more straightforward. If I take the court's questions to be reflecting some concern about how you uphold what the commission did on the merits without potentially opening up a loophole, I think the standing analysis is clear and the Supreme Court has been clear also. Now, the petitioners had an economic theory of standing. I think everyone agrees that economic harms are outside the zone of interest. They say that their harms are mixed, environmental and economic. But I think when you look at the declarations, the declarations are talking about members of the petitioners' organizations that operate qualified facilities and have money, you know, they like the money from selling QF power. They say they'll use that money for some environmental purpose. Just to clarify, are you talking about statutory standing or Article III standing? Correct, I think we have to make both arguments. So the zone of interest is statutory. The Article III is in response to their environmental. To me, it seems like the economic injury argument is it's much closer and so should survive Article III standing. We have not challenged the Article III standing of petitioners to challenge sort of the purpa, the substantive. So if you have a QF whose rates were changed or the terms of the contract. Judge only for NEPA. Yeah, and I think that's the case law we rely on is specific to NEPA. So the standing argument we raised, and they point to some declarations in the record as sort of filling in the gaps. But I think on inspection, they refer to one of their declarations, I think it's the Fisher Declaration, that suggests that if you had 2,000 megawatts more renewable in Georgia, then that would offset a certain amount of fossil fuel power. But the declaration does not connect the orders here to that fundamental premise, that you would have more QF generation in Georgia. In fact, the declaration seems to be based on the approach that the states in question had taken even before the orders here. So the big problem, I think, for petitioners is that now, even if you assume that these orders would encourage QFs to a lesser degree than the previous rule, the court still has to make an assumption about whether non-QF renewables, which are the dominant amount, so renewable energy projects that are not relying on purpose framework, which are the dominant amount in the market, would step in. So in other words, what's good for QFs is not automatically good for the environment. I think that's the problem in the speculative nature of their causal chain. On the merits of the NEPA question, I guess I would say just that the court does apply the arbitrary and capricious standard of review. I think the court's cases, Ilano, show that we don't have here anything that defines kind of the scope and limits of the proposed development. You're dealing with a national rule and the effort to create a framework to predict what would happen in any particular place just goes a little bit beyond what the Supreme Court said in Public Citizen in terms of NEPA only requires an agency to consider reasonably foreseeable environmental effects that are causally related to the action. On the question about remedy, Your Honor, I hope we don't get there. We think the correct remedy would be to remand without vacator under the court's cases, including cases cited in footnote 17 of our brief. That remedy is available, including in NEPA cases. We cited a case from this court on NEPA and the disruptive effects, both for FERC, which is already adjudicating QF certifications, but also for states which have begun the process. I would disagree with the other side's characterization that states are already implementing the Order 872, but there are a few states that have started implementing it. And I think the court has said that the risk of an interim change, which might itself again be changed, in other words, the interim change caused by this court imposing vacator, is a factor weighing in favor of remanding without vacator. And I think, just to respond to the court's questions, it is black letter law that if the commission does an environmental assessment, it can conclude that there are environmental effects or not, and that doesn't compel them to take any particular action. So I think the remand without vacator framework focuses on the procedural nature of a violation. Is it something the agency can remedy on remand? And I think they could. I mean, it would be open to the commission, I guess, after the EA to issue another order if they wanted to. So it wouldn't be a toothless remedy by any case. But our respectful submission would be to deny the petition for review if you don't, then to remand without vacator. All right, thank you. Thank you, Your Honor. Let's put two minutes on the clock. Thank you, Your Honor. I think it's important to put FERC statements about the avoided cost rule in context, because what the agency is now saying in its new order is that if fixed energy rates in a contract exceed the avoided costs at the time of delivery when you totaled them at the end of a contract, over the term of a contract, this is a statutory violation. This isn't ambiguous. It's crystal clear. Even from the respondent's brief at page 57, where the agency says, if the avoided cost forecast used to set a fixed qualifying facility rate in a contract ends up being higher, ends up being higher than the purchasing utility's actual avoided costs over the term of the contract, then the fixed rate based upon the forecasted avoided costs necessarily will have exceeded the utility's avoided costs. And you have a statutory violation. That is fundamentally inconsistent with what the agency said in Order 69, which is that forecasted rates, fixed energy rates based upon estimates, that those would be consistent with the statute. And why? Because first of all, the statute doesn't actually dictate how you calculate avoided costs. This gets to Judge Bumate's question, which I was trying to answer in my initial presentation, which is the statute doesn't tell FERC how to do that. FERC has made this crystal clear. In the New York State Electric and Gas brief, it said that the agency, quote, was not required to tie its avoided cost rate methodology only to calculations of avoided costs, which exist at the time of delivery. But that's exactly the position that the agency is taking now. So we do think that there is a course reversal here. And if you go back and look at Order 69 and track its reasoning, you see why. Because again, under the agency's new rule, if fixed energy rates exceed the avoided cost at the time of delivery, you don't have contract risk from the utility's perspective. You don't have revenue certainty because the qualifying facility might well have to give money back at the end of a contract if it has to true up. So these positions are inconsistent. My friend, Mr. Estes, points to the fact that the regulation still permits states to authorize these contracts, but we believe that that merely exacerbates the arbitrary nature of this rule. Why? Because if fixed energy rates violate the statute, if they exceed avoided costs, and qualifying facilities don't have entitlement to them, the agency can't allow the states to permit that exact statutory violation on its own theory. So we submit that doesn't help the agency. It actually highlights the arbitrary nature of its rule. The final thing I would say is, my friend collapsed fixed capacity rates with fixed energy rates there. But Chairman Glick makes very clear in his dissent that these are different and that the qualifying facilities don't actually have the kind of entitlement to or right to fixed capacity rates that FERC is assuming here and in its briefs. All right, thank you very much, counsel. Thank you. Yeah, I just wanted to address a couple of things briefly. I think Mr. Estes claimed again, similar to in the briefs in the order that there was no change that the FERC had always based its fixed price rule on an assumption that over and under price estimations between short run and long run calculations would even out. But I would refer the court to the FERC's own words, which are quoted on page 37 of our reply brief, which is what FERC told the DC Circuit in a brief in 1996. FERC said PURPA rules were not predicated on the assumption that over estimations and under estimations would balance out over the life of an individual contract. That's one of several statements that we quote where the reflected FERC's actual interpretation when it wrote the rule consistently all the way through the 90s and as best we can tell until the notice of proposed rulemaking in this case. So it's insistence now that it always interpreted it that way remains even in the argument today an unacknowledged change in FERC's position. Additionally, I wanted to address what I heard, which sounded like extra record evidence by Mr. Estes on what the Chamber of Commerce said about the first few months of 2022 and QF development. That's not a statistic I'm familiar with, it's not in the record. What is in the record is what happened in Idaho, for example, when fixed price, long-term fixed price contracts were rescinded by that commission. Renewable QFs dropped off a cliff to zero, right? That's the actual record evidence of what happens when these rule changes rescinding the rights provided in 1980 occur. And with that, we'd ask that the court. I'm sorry, can I ask one question? If we were to remand for under NEPA without vacatur, would that help you in any way? Or is that just a useless remedy for you? Having the agency actually look at what it's doing and the results of it is a benefit to us and to the public, I think. It will include some comment. But again, as I said earlier, the whole idea that this is just a procedural violation, it's like NEPA is a procedural rule. I mean, that's the point of it, but it has teeth in that it assumes agencies take that information into account when making its substantive decisions. And so to let the substantive decision lay without, and assuming that it would be the same with the information that the agency still hasn't done, but would in an EA, I think puts the cart before the horse. Thank you. All right, thank you very much to all counsel for your arguments in this case. They were very helpful. The matter is submitted and we're in recess until tomorrow morning. Thank you.
judges: NGUYEN, MILLER, BUMATAY